## Case No. 12,448.

SCHENCK et al. v. The FREMONT.

[1 Bond, 57.] [1]

District Court, S. D. Ohio. April Term, 1856.

COLLISION—RIGHT OF WAY—RIVER NAVIGATION—MUTUAL FAULT.

1. In a suit for collision, to entitle the libellant to a decree for full damages for the injury. it must appear not only that the respondents' boat was in fault, but that the libellant's boat committed no error which contributed to the collision.

2. An up-going boat has a right to choose which side of the down boat she will take, and to signal accordingly, but has no right to insist on this rule when its observance will render a collision probable.

3. As a general rule, the proper place of a down boat is in the main channel.

4. Where there is mutual fault, by the well-settled rule of maritime law, there must be a division of the damages; and such is the decree in this case.

[This was a libel by Ulysses P. Schenck and others against the steamboat J. C. Fremont, to recover damages sustained by collision.]

Lincoln, Smith & Warnock, for libellants.

Fox & French, for respondents.

OPINION OF THE COURT. The case set out in the libel is, substantially, that before daylight, in the morning of January 5, 1855, the steamer Switzerland, with a cargo on board, and a loaded barge in tow on the larboard side, was proceeding on a voyage from

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

Cincinnati to New Orleans, and that a short distance above the town of Ghent, in Kentucky, and when near the Kentucky side of the river, the steamboat J. C. Fremont was seen to leave the wharf-boat at the town of Vevay, on the Indiana side, and soon after, instead of passing up near the shore of Vevay Island, crossed the river toward the Kentucky side, and in thus crossing, came in contact with the barge of the Switzerland, striking it on its starboard quarter, carrying away the forward part of its bow, causing it to take in water rapidly, injuring its lading, disabling it from proceeding, and thereby occasioning great injury to the libellants, in the expense incurred in repairs, damage to the cargo, and the detention of their boat. It is averred in the libel that the loss and injury thus sustained, was caused wholly by the fault, negligence, and want of skill of those in charge of the said steamer Fremont, and that no fault is imputable to those intrusted with the management of the Switzerland and the barge connected with it. The respondents aver, in their answer, that the Fremont was proceeding from Louisville to Pittsburg; and, that having landed at the town of Vevay, for the transaction of its business there, started out from the wharf-boat of said town, and crossed the river, to near the Kentucky side, and then proceeded up the river, near the shore, the usual place of an ascending boat, at that stage of water; and that while thus going up, the Switzerland, with a barge in tow on the larboard side, was seen coming down on the larboard side of the Fremont, and continued that course till within one hundred and fifty yards of the said boat, when the Switzerland changed its direction toward the Kentucky shore, and thus proceeding, the barge struck the larboard bow of the Fremont, thereby breaking its planks, timbers, etc. The answer alleges that the collision took place about half a mile above said town of Ghent, the Fremont then being in the proper place of an ascending boat, and that it was due wholly to the improper navigation of the Switzerland, without any fault on the part of the said Fremont.

This brief statement of the material allegations of the libel and answer is sufficient to show the matter in controversy in this case. It also shows that the claims of these parties, as to the facts involved, are so directly in conflict that they can not be reconciled, and wholly exclude the supposition that both are consistent with truth; and, as is almost proverbially common in suits growing out of marine collisions, each party has been successful in sustaining by evidence the assumptions set up respectively in the pleadings. Thus the court is presented with a case, in which the evidence, as to the more essential facts, is palpably contradictory and discrepant. Under such circumstances, the duty devolving on a court of fixing on a satisfactory basis for a decree is not always easy or pleasant.

It may be premised, that in the consideration of the facts of this case, the conclusion is read-

ily reached that the collision in question could not possibly have occurred without fault of one or both of these boats. On whatever other ground it may be placed, it is certain it can not be attributed to inevitable or unavoidable accident. Indeed, it is hardly possible to conceive of circumstances in which a collision was less necessary, or less excusable. This conclusion fairly follows from facts not in controversy in the case. The libellants' boat, coming in at the head of Vevay Island, was distinctly seen by the pilot of the Fremont; and the latter boat was as distinctly seen by the pilot of the Switzerland, being then in the act of putting out from the wharf-boat, at Vevay. The boats were first mutually seen a little after five o'clock in the morning. The night had been light and fair, but it had become somewhat cloudy toward morning, still it was not so dark but that the boats could be easily seen. The distance between the points where the boats became mutually visible did not exceed two miles, and was probably not more than a mile and a half. An island, the lower end of which is nearly half a mile from the Vevay wharf-boat, stretches up close to the Indiana side of the river, and is something more than one mile in length. The shores, both on the island and the Kentucky side, are nearly straight, so that there is hardly any noticeable bend in the river, and nothing to intercept the view from the Vevay wharf-boat to the point where the Switzerland came in view, at the head of the island. About one-third the distance down, from the head of the island, the river is, by actual measurement, four hundred and fifteen yards in width, and gradually widens, till, at the lower end of the island, it is four hundred and ninety-two yards. At the time of this collision there was nine or ten feet of water in the river; and from the Vevay wharf to the head of the island, there was but little variation in the depth across from near the island shore to the Kentucky side. The proof is conclusive, that along either shore, or in the middle of the river, there was sufficient depth of water for the safe navigation of these boats. And it is equally clear, that between the points indicated, there is no obstruction or impediment of any kind. The channel, or that part of the river between the island and the Kentucky shore, having the swiftest water, is one-third or one-fourth the width of the river from the latter shore, or, measured by yards, the distance varies from something upward of one hundred to one hundred and fifty. But, as before noticed, the water is deep on either side of the channel, along and near to both the island and Kentucky shores.

Yet, under circumstances so favorable to the safe passage of boats on this part of the river, and which would seem almost to exclude the possibility of a collision between a descending and an ascending boat, the Switzerland's barge and the Fremont were brought into violent contact, and injury, direct and incidental, has been sustained to a considerable amount. And now the in-

quiry which presents itself is, whether this injury is attributable solely to the faulty management of one of these boats, or do the facts warrant the conclusion that both are in fault. As already stated, the claim of the libellants is for compensation for the whole of the injury sustained by them, and this claim is based on the theory that their boat was not in fault, but that the injury resulted wholly from the careless and unskillful navigation of the Fremont; and, if the evidence sustains this position, the maritime law will afford the redress sought for. But, to justify a decree on this basis, it is not enough that the libellants prove a want of caution, vigilance, and skill in the management of the respondents' boat. It must appear that those intrusted with the management of the libellants' boat are free from censure, and have done nothing which may be supposed to have contributed essentially to the disaster. As promotive of the great interests of navigation and commerce, the maritime law is stringent in its requirements of caution and skill in the management of boats and vessels. And a party who has failed to comply with these exactions presents no sufficient ground to recover the entire damages resulting from a collision.

In the consideration of this case, I do not propose to notice minutely, the great mass of evidence which has been introduced. I will merely advert to such prominent features of the transaction involved, as seem to indicate, with sufficient certainty, the decree which should be pronounced. The evidence of the parties, in some essential particulars, as to the course and navigation of these boats, from the time they were seen by the pilots of each, is in such direct conflict as to render any attempt to harmonize it entirely futile. Seven witnesses for the libellants, including the pilot and others who were on their boat, substantially agree in these statements, that the Switzerland, according to the usual course of navigation for a descending boat, came near to the Kentucky shore, at the head of Vevay Island, and continued down that shore, at a distance from it, variously estimated at from thirty to sixty-five yards, without any variation of course, to the place of the collision. These witnesses also concur in saying, that the Fremont, when first seen, was starting out from the Vevay wharf-boat; and that it proceeded up on the Indiana side, in the direction of the foot of the island, and kept near the island shore, about one-third the length of the island, and then changed her course nearly straight across the river, and in the crossing, struck the bow of the barge about fifteen feet from its stern, nearly at right angles. They also agree in saying the barge was on the larboard side of the Switzerland, and so fastened to it, that the bow projected thirty-five or forty feet forward of the steamer's bow; and that

the blow of the Fremont cut off the forward part of the barge, causing the water to flow in freely, and parting the lines by which it was fastened to the steamer. The testimony of these witnesses, as to the course of the two boats before the collision, and their relative positions when it took place, is corroborated substantially by four other witnesses, some of whom were on the Vevay wharf-boat, and some on the deck of a steamer lying there when the Switzerland came in view at the head of the island, and who testified that they noticed the course and movements of both boats up to the time of the collision.

On the part of the respondents, four witnesses who were on the Fremont, among whom are the pilot and mate on watch at the time, state, in substance, that on putting out from the wharf-boat at Vevay, the steamer did not go up to or near the foot of the island and along the island shore, but crossed almost straight across to the Kentucky side, and straightened up within fifteen or twenty yards of the shore, nearly opposite an old mill, which is only two hundred yards above a line drawn straight across from the wharf-boat. They also say the Fremont kept up that shore, without any change of course, to the place of the collision. And the pilot says the Switzerland, when the boats struck, was pointed toward the Kentucky shore. This evidence, given by the respondents, sustains the allegation of their answer, but it is clearly disproved by the libellant's evidence, before referred to. Unless this evidence is arbitrarily repudiated, it must be held as conclusively established that the Fremont did not cross directly from the wharf to the Kentucky side, and was not near that shore when he signaled for it, but was making a crossing a little above the foot of the island, in such a way as almost unavoidably to cross the path of the down-going boat, and necessarily to incur the hazard of a collision.

The usual course of navigation for an ascending boat, starting from the Vevay wharf-boat, as proved by a number of experienced and intelligent river navigators. unless business requires a straight crossing from the wharf-boat, is to go up to near the foot of the island, and then along and near to the island shore, about one-third or one-half the length of the island, and then to wear out gradually toward the Kentucky side. These witnesses state that the water is deep along the island, and there being little or no current, is preferred by up-stream boats. Same witnesses, however, say this course is not universally pursued. It would seem, however. to be the proper course for an up-going boat, when a boat was seen coming down from the head of the island. And if the Fremont had been thus navigated, it is certain no collision would have happened.

It is insisted, however, that by the acknowledged law of the river, it is the right of the up-going boat to choose which side of the river it will take, and therefore it was the right of the pilot of the Fremont to cross to the Kentucky side. This rule is affirmed by the board of supervising inspectors, under the act of 1852, in case the ascending boat gives the signal required to notify the descending boat of his choice. But it is very clear no pilot has a right to insist on this rule when its observance would incur the hazard of a collision. It has always been a paramount law of navigation that no circumstances will justify a course of action that must necessarily, or even probably, lead to such a result. Hence it is a part of one of the rules adopted by the supervising inspectors that "no vessel shall be justified in coming into collision with another, if it be possible to avoid it."

Without pursuing this subject further, I must conclude, from the weight of the evidence before me, that the Fremont was wrong in attempting to cross the river in front of a down-coming boat. It is proved that those having charge of this boat were informed at the Vevay wharf-boat that the Switzerland was expected about that time. and was to land there. When the Fremont left the wharf, the other boat was in view at the head of the island. The distance between the boats. when first seen. did not exceed two, or at most, two and a half miles. The Switzerland, it is proved, was running at a speed of about ten miles an hour, and the Fremont at about seven miles an hour. The added velocity of the two boats would therefore be seventeen miles an hour, or nearly at the rate of a mile every three minutes. Supposing the distance from the head of the island, where the Switzerland was first seen, to the Vevay wharf-boat, to be two and a half miles, the boats would pass each other in something less than five minutes. But if, as the weight of the evidence proves, the Fremont started across a short distance above the foot of the island, making allowance for the distance the other boat would get down while the Fremont was reaching the point at which it started across, the boats must have been then very near each other. Now, it is in evidence by a witness, to whom entire credit is due, that it is never safe for a boat to cross the path of the down boat, if the two boats are at a less distance than two and a half miles apart. And he states it as his uniform practice, when wishing to cross the river, with a descending boat in view within the distance above stated, to lie to till the boat has passed. This course is the safe and prudent one, and its observance would avoid the possibility of an accident by collision.

The conclusion that the Fremont was pointed toward the Kentucky side, and not straight up the river, at the time of the collision. is greatly strengthened by the above proof that

the bow of the steamer struck the barge nearly at right angles. Such is the statement of several witnesses who saw the collision, and such is the inference to be drawn from the nature of the injury which the barge sustained. This is further inferable from the fact that after the barge was struck, and parted from the boat by the force of the blow, the Switzerland, having still some headway, struck the Fremont on its larboard side, abreast of the boilers. This would indicate pretty clearly that the Fremont must then have been quartering across the river, and not straight with it.

I can not, therefore, hesitate in the conclusion that the pilot of the Fremont committed a great error in attempting to cross the river before a descending boat. It was wholly unnecessary, and apparently without excuse. That it was a principal cause of the collision is clear beyond controversy.

But it is insisted that the Switzerland was also in fault in not coming down in the channel of the river, that being the proper place for a descending boat, and that this error contributed to the collision which occurred. In the consideration of this part of the case, I shall not advert to the evidence in relation to the signals given by these boats. This evidence is involved in such obscurity and doubt by the contradictory statements of the witnesses, that it is impossible to arrive at any satisfactory conclusion as to the facts. And if it is clear that the pilot of the Switzerland committed a culpable error in putting his boat in the wrong place, it is not, perhaps, material to ascertain what signals were given, or the order in which they were made. By the well-understood usages of the river, applicable, certainly, wherever the river is wide and affords a sufficient depth of water for its entire width, the place of a descending boat is in the channel, or that part where the current is the strongest. This is the rule sanctioned by the supervising inspectors, and is, in itself, reasonable. If, then, it is admitted that the Switzerland gave the first signal, indicating the purpose of the pilot to go down on the Kentucky side, it would seem, under the circumstances of this case, that he was asking what he had no right to claim. The width of the river opposite Vevay Island has already been stated, as also the fact that there was sufficient depth of water anywhere between the island and the Kentucky shore. The evidence is that the channel is about one-third or one-fourth of the width of the river from the Kentucky shore. For about half the distance down the island the channel would be from one hundred to one hundred and thirty yards out from that shore, and toward the lower end of the island, where probably the collision took place, from one hundred and thirty to one hundred and sixty yards out. Now, it is beyond all controversy that at the time of the collision the distance of the boats from the Kentucky shore did not exceed thirty yards. Without noticing the other testimony

as to this point, there is one fact which seems to settle it beyond doubt. That fact is, that immediately after the collision, and as the result of the striking of the bow of the Switzerland against the Fremont, the latter boat was forced on to the shore, or so near to it that some of the crew jumped off without the aid of a plank. This could not have happened on any other supposition than that the boats were in close proximity to the shore. Several of the libellants' witnesses state the distance at from thirty to fifty yards, while those on the Fremont put it at twenty-five or thirty yards.

It results from this view, that when the collision occurred the Switzerland was about one hundred yards from the proper place of a descending boat. And it seems clear that this was such an essential departure from the settled rules of navigation as to justify the inference that there was a want of due vigilance, care, and skill on the part of those having the management of this boat. It is not excused by the fact that there was a barge in tow on the larboard side, as the evidence is that although it would be convenient to go down close to the Kentucky shore, to afford more room for rounding to at the Vevay wharf, there is no positive necessity for it, and it does not form an exception to the known and settled usages and rules of navigation.

There is another aspect of this case to which I will very briefly refer, which, in my judgment, affords a ground for the inference that there was a want of caution and care in the management of these boats which properly subjects both to liability for the injury sustained by this collision. It has been before remarked that the evidence in relation to the signals given is so conflicting and unsatisfactory as to preclude the possibility of knowing the truth in regard to them. After a very critical examination of the evidence, I confess I have not been able to reach any conclusion on this subject. There are, however, some general views which may be pertinently stated in reference to this part of the case, and from which the inference of mutual culpability in these boats may be fairly deduced. And, in the first place, I may remark that no omission of any act necessary to avoid a collision is justifiable. Notwithstanding the almost inextricable confusion in which the evidence has placed this case in reference to the signals, there are still grounds for the conclusion, either that all the signals given were not heard, or, if heard, were not understood by the pilots, respectively, of these boats. It was, then, obviously the duty of both, having reasonable grounds even for a suspicion that there was any misunderstanding or misconception on this subject, at once to have stopped their engines, or, if the case required it, to have backed, until they should know with certainty the safe course to pursue. These precautions were not observed by either of these pilots. If, as the libellants claim, the Fremont improperly started across the river,

with the apparent purpose of crossing in front of the Switzerland, the pilot should instantly have stopped and backed. The distance then separating the two boats was such that this measure would most certainly have avoided a collision. The pilot of the Fremont, having reason to believe his signals were not heard, or not understood, and seeing the other boat persisting in her course, should also have stopped and backed. Now, although it is in proof that both boats did reverse their engines, it was when they were so near as to render a collision unavoidable.

In the argument, it was insisted by the proctor for the respondents that the doctrine of the maritime law, which recognizes the rule of a division of the damages in a case of mutual fault, had not been authoritatively sanctioned by the courts of admiralty in this country. It is, however, well known that this principle has prevailed for many years in the courts of the eastern districts of the United States. It has not, till recently, been distinctly affirmed by the supreme court of the United States. In the case of The Catharine v. Dickinson, 17 How. [58 U. S.] 170, the court say: "Under the circumstances usually attending these disasters, we think the rule dividing the loss the most just and equitable, and as best tending to induce care and vigilance in navigation."

But, without taking more time in presenting my views of this case, I will state that on the grounds indicated, it seems to me, it is one of mixed or mutual fault, justifying an equal apportionment of the damages sustained between the two boats, and such is the decree in this case.